# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TENNESSEE
### WESTERN DIVISION

| | | |
|---|---|---|
| **DENNIS HART,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | **No. 09-2108-STA** |
| **PENSKE TRUCK LEASING COMPANY;** | ) | |
| | ) | |
| **Defendant.** | ) | |

## ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Before the Court is Defendant Penske Truck Leasing Company's Motion for Summary Judgment (D.E. # 25) filed on May 20, 2010[1]. Plaintiff Dennis Hart filed a response in opposition to Defendant's Motion on June 19, 2010 (D.E. # 26). Defendant filed a reply brief (D.E. # 38) on July 22, 2010, and Plaintiff filed a surreply on August 11, 2010 (D.E. # 42). For the reasons set forth below, Defendant's Motion is **GRANTED**.

## BACKGROUND

For purposes of this motion the following facts are undisputed unless otherwise noted.

Plaintiff, a black male, began working for Penske Truck Leasing Company in September 2003 as a "Tech 1" under the company's collective bargaining agreement with his union, Teamsters Local No. 984. Def.'s Statement of Undisputed Facts ¶ 1. As a bargaining unit employee, the CBA governed many aspects of Plaintiff's employment, including his

---

[1] On July 15, 2010, Plaintiff filed a Stipulation of Dismissal as to Republic Parking System, Inc. and Larry Cullen (D.E. # 30).

compensation and his conduct as a Penske employee. *Id.* Under the terms of the CBA, certain violations of the CBA's employee conduct provision were "cardinal sins" that would justify the immediate termination of Plaintiff's employment without applying any progressive discipline. *Id.* at ¶ 2. Those "cardinal sins" included refusing to carry out a reasonable work instruction or direct order of a supervisor, as well as engaging in threatening behavior towards another employee. *Id.* Penske also maintained a zero tolerance policy for workplace violence, which similarly provided that employees could be terminated without progressive discipline for threatening other employees. *Id.* at ¶ 3.

Plaintiff was originally stationed to work at Penske's Whitten Road facility in Memphis, where he performed maintenance on the company's large container trucks. *Id.* at ¶ 4. This maintenance work included repairing the trucks' air conditioning units but did not include working on their refrigeration systems, which were used to store frozen foods in the trucks' containers. *Id.* Other technicians at the Whitten Road facility, known as "Reefer Techs," were responsible for that work and were assigned a separate job classification under the CBA. *Id.*[2]

In April 2004, Plaintiff transferred to Penske's Hanger Road bus shop, where he and another employee, Chris Transor, serviced a number of shuttle buses that Republic Parking Systems, Inc. ("RPS") operated for the Memphis airport. *Id.* at ¶ 5. Plaintiff eventually became the shop's lead technician and was responsible for running its day-to-day operations. *Id.*[3]

As the lead technician, Plaintiff was expected to communicate with Larry Cullen, RPS'

---

[2]  Plaintiff notes that he enjoyed a good working relationship with his supervisors and did not complain about his pay rate or job classification while working at the Whitten Road facility.

[3] Plaintiff elaborates that his day to day responsibilities included prioritizing workload for repair and maintenance of the airport shuttle buses at the bus shop.

shuttle operation manager, to ensure that the buses were operating well enough to meet RPS' needs.  *Id*. at ¶ 6.  He and Transor accordingly performed routine maintenance and special repairs "from the tires to the top" of each bus at the shop, which included working on their air conditioning units.  *Id*.  The Defendant contends that none of these buses had refrigeration containers, so neither Plaintiff nor Transor were ever required to perform Reefer Tech work.  *Id*.  The Plaintiff, however, strongly disputes this contention.  Plaintiff asserts that while neither he or Transor were classified as Reefer Techs under the CBA, the nature of the work they did on the air conditioning units was the same as those of the Reefer Techs.[4]  For instance, both the Plaintiff and Transor were required to open the air conditioning units and calibrate the freon pressure, which he alleges they could only legally do with a 608 certification to comply with EPA regulations.

In December 2006, Plaintiff made a side arrangement with RPS to clean their offices and the airport's shuttle buses once a week for a set price.  *Id*. at ¶ 7.  The arrangement had no specific duration and could be cancelled at any time by either Plaintiff or RPS.  *Id*.  The Defendant contends that the Plaintiff did not tell his supervisor, Jim Stiel, or anyone else at Penske about this arrangement.  *Id*.  Plaintiff, however, asserts that this agreement was no secret because he performed the work at the bus shop.

In the late summer of 2007, the Defendant contends the Plaintiff refused to repair an

---

[4] Plaintiff further notes that he had various discussions regarding this matter with District Manager Cal Alexander, Terry Keen, District Service Manager Andy Adams, and former managers Jeff Hunt and Chris Ziegemeier and that Cal Alexander brought this issue to Penske's corporate office's attention.  Additionally, Plaintiff contends that his Union confirmed that the certification for working on the large bus air conditioning units were the same as requirements for a Reefer Tech.

evaporator box for one of the bus's air conditioning units.  *Id.* at ¶ 8.  The reason for this refusal was Plaintiff's belief that doing a/c work was not in his "Lead Tech I" job description, and that he was entitled to Reefer Tech pay whenever he performed a/c work.  *Id.*  According to the Defendant, Plaintiff specifically believed that because he carried the same 608 certification that Reefer Techs were required to carry, he was entitled to receive the same pay as them.  *Id.*  Plaintiff strongly disputes Defendant's contention that he ever refused to work on an evaporator unit.  Additionally, Plaintiff asserts that he had many conversations and meetings with his local Penske managers about performing work that was not within his job classification under the CBA and in fact was told he could demand the higher Reefer Tech pay rate.

The 608 certification is provided by the EPA and required for individuals performing work on complex refrigeration containers.  *Id.* at ¶ 9.  The 609 certification is required for vehicle air conditioning units.  *Id.*  609 certification is the only certification requirement for technicians working at Penske's bus shops because the position requires the occasional performance of a/c maintenance and repairs.  *Id.* at ¶ 9-10.  As such, the Defendant contends that it did not ask or require Plaintiff to obtain the 608 certification for his Lead Tech position.  *Id.*  Plaintiff disagrees with Defendant's contention that he was not required to obtain the 608 certification.  Although Plaintiff had obtained his 608 certification prior to his employment with Defendant, Plaintiff asserts that he and Transor were required to routinely open air conditioner units on the large buses. This is a task the Plaintiff contends could only be performed with a 608 certification.

Additionally, the Defendant notes that there is not any language in the CBA that states a 608 certification alone entitles a worker to be paid as a Reefer Tech.  *Id.* at ¶ 12.  While the

Plaintiff admits that the CBA is silent regarding the specific job description of a Reefer Tech, he contends that his Union confirmed that the certification for working on the large bus air conditioning units was the same as for a Reefer Tech.

In late July 2007, Cal Alexander, Plaintiff's District Manager, informed the Plaintiff that his continued refusal to perform a/c work could result in either his suspension or termination. *Id.* at ¶ 13. Plaintiff emailed Alexander on August 1, 2007 to confirm this understanding. *Id.* Plaintiff strongly disagrees with the Defendant's assertion. The Plaintiff contends that he never refused to perform the air conditioner work. In fact, Penske was outsourcing the work to an outside firm, Crows. When the decision was made to bring the work back in-house, there were discussions between Chris Ziegemeier, Terry Keen, and Cal Alexander regarding changing Plaintiff's classification to Reefer Tech. In the interim, Chris Ziegemeier, Plaintiff's supervisor at the time, allegedly agreed to allow Plaintiff to perform the work on an overtime basis in order to receive a rate of pay equivalent to that of a Reefer Tech. In a July 31, 2007, email to Ziegemier, Plaintiff stated that two buses were in need of repair, RPS2009 and RPS2005. He suggested that he would repair RPS2009 while RPS2005 should be sent to Crows. After his suggestion, Plaintiff allegedly met with Alexander. According to the Plaintiff, Alexander threatened to fire him if he did not perform the repairs on both buses. As such, Plaintiff performed the repairs as directed.

On August 2, 2007, Plaintiff filed a grievance with his Union, complaining that Defendant's failure to give him Reefer Tech pay was a violation of the CBA. *Id.* at ¶ 14. After Defendant denied the grievance, Plaintiff's Union declined to pursue it any further on his behalf, saying specifically that it did not have "enough merit" and that "no language" in the CBA

supported his claim for Reefer Tech pay. *Id*. While the Plaintiff admits that the Union did decline to pursue his grievance, the Plaintiff notes that the Union also stated that there was an oversight in the language of the CBA which precluded arbitration of the issue. Furthermore, the Union stated that "the requirement to work on a Bus A/C unit requires the same certification as a Refrig Tech, but is not classified as a Reefer Unit."

On August 9, 2007, Plaintiff sent Alexander and Ziegemeier an email complaining that Defendant's failure to give him the additional compensation and to require white Techs to perform the same a/c work as him, was race discrimination. *Id*. at ¶ 15.[5] Terry Keen, Defendant's Human Resources Manager, responded to Plaintiff's August 9th email by letter on August 16, 2007. *Id*. at ¶ 16. The letter explained why Defendant believed that Plaintiff's request for Reefer Tech pay and his allegation of discrimination were without merit. *Id*. After this correspondence and the decision by Plaintiff's Union not to pursue his grievance, the Defendant thought that Plaintiff's compensation issue had been fully and finally resolved. *Id*. at ¶ 17. Plaintiff asserts that Defendant's conclusion was misplaced as he had filed a charge of discrimination with the EEOC six days before Keen's letter. The charge was pending before the EEOC for a year and a half.

---

[5] The Court notes that the Plaintiff does not seem to dispute this factual assertion. In fact, Plaintiff does not specify whether the assertion is "disputed" or "undisputed." Instead, Plaintiff seems to discuss the merits of his racial discrimination claims. For instance, Plaintiff notes that although he believed he was entitled to Reefer Tech pay for performing certain work on air conditioning units, he also believed that if he was going to be required to do the work without Reefer Tech pay, then similarly situated white employees like Scott Carlisle and Ron Benucci should be required to do the same. According to the Plaintiff, Carlisle and Benucci were certified as Tech I's with 608 certifications, worked at the bus shop, and reported to Jim Stiel just like him. Carlisle and Benucci, however, were not required to do the work on the air conditioning units when they refused.

Before the end of August 2007, Plaintiff injured his right elbow at work and was instructed by his doctor not to use his arm for a couple of days.  *Id.* at ¶ 18.  Plaintiff asked Ziegemeier for a light duty work assignment but none was available, so Plaintiff was allowed to take paid vacation until he could return to work.  *Id.*  Plaintiff disputes that no light duty work was available at the time of his injury.  More specifically, Plaintiff contends that portions of his Lead Tech job could have been done while under medical restriction or he could have worked in the district office.  Plaintiff asserts that the Defendant had a history of creating light duty positions for injured employees.

In April 2008, the Defendant contends that Cullen informed Adams that the Plaintiff would not speak to him because he had commented that Plaintiff's wife charged too much for catering RPS' Christmas party that year.  *Id.* at ¶ 19.  This conversation lead to the disclosure of Plaintiff's cleaning deal with RPS.  *Id.*  After learning this information, Adams met with Plaintiff concerning the potential conflicts of interest that were created by this relationship.  *Id.*  Plaintiff disputes Defendant's contention that he would not speak with Cullen.  He admits that he felt Cullen made inappropriate comments, but he continued to maintain a working relationship with him.  Additionally, during the conversation between Adams and Plaintiff, Adams allegedly told the Plaintiff that if he did not withdraw his EEOC charge Adams would have the cleaning arrangement with RPS cancelled.  *Id.* at ¶ 20.[6]

In August 2008, the Defendant alleges that Plaintiff received a series of minor overpayments and reported them to his supervisor, Stiel.  *Id.* at ¶ 21.  Stiel told the Plaintiff not

---

[6] Plaintiff also alleges that Adams told him that the Defendant had many lawyers and that it made no sense to continue his employment with Defendant if he sued them.  It is not clear to the Court, however, if these statements were made during the 2007 meeting.

to worry about the overpayments, but the Plaintiff believed that he was trying to set him up for false accusations.  *Id*.  Plaintiff does not dispute that he received the overpayments or that he informed Stiel.  Instead, Plaintiff adamantly disputes Defendant's characterization of his concerns.  Plaintiff contends that he felt with each incident, he could be fired at any moment.[7] Plaintiff also felt that Stiel was trying to set him up for false accusations in October 2007, when the shop's warehouse alarm was not functioning properly and Stiel told the airport it needed to be fixed.  *Id*. at ¶ 22.[8]

RPS cancelled the office cleaning portion of its agreement with Plaintiff in September 2008 because another cleaning service could perform the work at a lower rate.  *Id*. at ¶ 24.  The Defendant contends it had no input into RPS' decision.  *Id*.  The Plaintiff, however, strongly disputes Defendant's involvement with the termination of his agreement with RPS.  Plaintiff alleges that Adams threatened to have his contract terminated if he did not drop his EEOC charge.

Also, in the fall of 2008, Stiel informed Plaintiff that he needed to take a drug test at the end of one of his shifts.  *Id*. at ¶ 25.  The drug test was legally required to maintain Plaintiff's CDL license and was required for many of Defendant's employees.  *Id*.  The Defendant alleges

---

[7] Plaintiff also notes that his fears were affirmed when "none of Penske's managers would address Plaintiff Hart's report of disparaging remarks make towards him."  Plaintiff, however, does not identify who allegedly made the disparaging remarks. Plaintiff also notes that Larry Cullen allegedly told his assistant, Nathaniel Moody, to pray for Dennis and Chris because they might not be at Penske when Moody returned from vacation.

[8] The Defendant also contends that Stiel and Plaintiff's relationship began to deteriorate when Stiel told the Plaintiff to follow Cullen's instructions.  Def.'s Statement of Undisputed Facts ¶ 3.  Plaintiff does not specifically state whether this allegation of fact is undisputed or disputed.  Instead, Plaintiff contends that his relationship with Stiel deteriorated as a product of his EEOC charge.

that the Plaintiff preferred to take the test in the morning, rather than at the end of his shift which Stiel allowed him to do.  *Id*.  The Plaintiff believed that this incident was another example of Stiel trying to set him up.  *Id*.  The Plaintiff does not dispute that he was instructed to take the drug test or that he wanted to take it the following morning.  Plaintiff, however, notes that he was off the clock when Stiel made his request. As such, Plaintiff informed Stiel that he was leaving for the day.  Upon hearing this response, Stiel allegedly informed the Plaintiff that he could be terminated if he did not comply with the drug test request.[9]

In early December 2008, Stiel committed to have the rims on three of the airport's shuttle buses painted by January 16, 2009.  *Id*. at ¶ 27.  Plaintiff disputes that Stiel committed to have the painting done by a date certain.  The technicians used aerosol spray paint cans to paint the rims.  *Id*. at ¶ 28.  The Defendant contends that each bus would take fifteen or twenty minutes to paint, but the Plaintiff contends it was closer to an hour.

On the morning of January 6, 2009, Stiel emailed Plaintiff to ask about the status of the rims and relayed that they needed to be finished by January 16, 2009.  *Id*. at ¶ 29.  Plaintiff responded to Stiel's email at 9:50 am saying that he would get the rims painted when they came up for service, that it was too cold to paint them outside the shop, and that it was a safety hazard to paint them in the shop.  *Id*.  Plaintiff also stated that Stiel should not make commitments to RPS before checking with him first, as Stiel had no way of knowing what was going on in the bus shop.  *Id*.  Plaintiff does not dispute the content of his e-mail but contends that the Defendant mischaracterizes it.  Plaintiff notes that he stated that "we would paint the wheels" but "a number

---

[9] The Defendant also contends that in the Fall of 2008 Plaintiff had a conversation with a vendor about the 2008 presidential election results.  *Id*. at ¶ 26.  The Court, however, fails to see how this comment is in any way relevant to Plaintiff's claims.

of [shuttle buses] were down."  Plaintiff asserts that he was not actually refusing to paint the buses but was prioritizing more critical repairs before doing the work.  For instance, RPS2004 was in the shop for repair because it would not start.  However, Plaintiff was confident that he could meet the January 16 deadline.[10]

Later that morning, Plaintiff called Stiel to reiterate his message.  *Id.* at ¶ 31.  During the call, the Defendant alleges that the Plaintiff raised his voice and again told Stiel that he would not paint the rims because of his safety concerns, he was too busy, and it was not his problem that Stiel made the commitment to Cullen.  *Id.*  Plaintiff disputes that he raised his voice or that he refused to paint the rims.  He alleges that he suggested to Stiel that a better time to paint the buses would be when the weather was more conducive and the workload was not as critical. Stiel allegedly responded by cussing Plaintiff and then hung up the phone.[11]

One of the buses that needed its rims painted was in the bus shop.  *Id.* at ¶ 34.[12]  The

---

[10] The Defendant also alleges that the Plaintiff was mad at Stiel for making the commitment to Cullen to have the rims painted.  *Id.* at ¶ 30.  Plaintiff, however, disputes that he was mad.  He contends that he was "upset" to learn that Stiel had made the commitment without providing him the opportunity to include the commitment into his daily workload priority.

[11] The Defendant contends at the time Plaintiff spoke to Stiel on the phone the Plaintiff had no idea whether painting rims indoors was a safety hazard or presented OSHA issues.  *Id.* at ¶ 32.  He also did not file an official complaint to that effect.  *Id.*  Plaintiff disputes Defendant's characterization of his understanding of OSHA and safety hazards.  He notes that because he felt such painting was a hazard he had never spray painted the buses inside.  The Defendant also notes that the Hanger Road bus shop was between 10,000 and 15,000 square feet with large garage doors that could easily be opened to improve air circulation, and the building also has a fully functioning air ventilation system.  *Id.* at ¶ 33.  Plaintiff does not state whether or not he disputes this allegation.  Instead, he notes that he used the ventilation system to remove exhaust fumes by hooking ventilation hoses to the tail pipes of the buses.

[12] The Defendant also notes that the Plaintiff could have put on a jacket, opened the garage doors, activated the facility's ventilation system, and started painting.  This statement, however, appears to the Court to be analytical rather than fact based.

Plaintiff does not dispute that RPS1987 was in the shop on January 6th.  He does, however, dispute when the bus arrived.  Plaintiff contends that RPS1987 was not in the shop at the time he spoke with Stiel.  The bus was not brought into the shop until 11:42 am, an hour before his shift ended.[13]

After his phone call with Stiel, Plaintiff immediately called Adams to tell him what had occurred.  *Id*. at ¶ 35.  The Defendant alleges that the Plaintiff told Adams that he had refused to paint the rims and that Stiel told him to "shut the hell up" while they were on the phone.[14]  Adams told the Plaintiff that he would speak with Stiel concerning this matter and addressed his safety concerns.  *Id*.  Plaintiff sent Adams an email later that day to confirm their conversation.  *Id*.  Plaintiff does not dispute that he spoke with Adams or that he sent him an email.  He, however, contends that he never refused to paint the rims.[15]

Stiel also told Adams about his phone call with Plaintiff on January 6, 2010.  *Id*. at ¶ 36.  Stiel told Adams that he had instructed the Plaintiff to paint the rims but he refused.  *Id*.  Stiel then told the Plaintiff to clock out and go home.  *Id*.  The Plaintiff allegedly refused and stated that he did not have to listen to Stiel.  *Id*.  The Plaintiff disputes the Defendant's contention that he ever refused to paint the rims or that he was told to clock out and go home.

---

[13] The Plaintiff also notes that RPS1987 did not leave the bus shop until January 9, 2010 at 11:36 am.

[14] Plaintiff also alleges that Stiel said "you mother f[...]"

[15] Plaintiff notes that he sent Adams an email on the afternoon of January 6th.  In the email, he restated his complaint concerning the treatment he and Transor were receiving under Stiel's supervision.  He also asked for advice concerning the proper procedure to address this treatment.  Plaintiff contends that Adams never responded to his email.  He then sent Adams a second email on the evening of January 6th.  In the later email, Plaintiff stated "I never refused to do any work, but I am foremost concern with safety."  Plaintiff also notes that Adams called Jerry Newman, Penske's Safety Specialist, after he mentioned his concerns.

Adams also spoke with Jerry Newman, Penske's Safety Specialist, on January 6, 2009 to discuss Plaintiff's concerns about painting the rims indoors. *Id.* at ¶ 38. Newman confirmed that painting rims indoors did not pose a safety risk or OSHA violation. *Id.*[16]

After verifying online that one of the buses that needed its rims painted was in the shop, Adams called Terry Keen, Penske's Human Resources Manager, to discuss how to handle the situation with Plaintiff. *Id.* at ¶ 39. Adams and Keen agreed that the CBA authorized Plaintiff's immediate termination based on his refusal to follow Stiel's instruction, but they decided to only suspend Plaintiff so they could talk to Transor about the incident. *Id.* Plaintiff contends that Adams could not have verified that a bus needed to be painted before he called Keen. Plaintiff asserts that the first bus, RPS1987, did not arrive in the bus shop until 11:42 am. Plaintiff sent his response to Stiel's email at 9:59 am and called him approximately fifteen to twenty minutes later. Stiel went to Adams office immediately after his conversation with Plaintiff, and Adams called Keen after he spoke with Stiel. As such, the Plaintiff contends that Adams's call to Keen was placed before the bus arrived in the shop at 11:42 am. Plaintiff also disputes that Adams contemplated terminating him in the conversation with Keen.

At approximately 12:00 pm on January 6, 2009, Adams and Stiel went to the bus shop to suspend the Plaintiff. *Id.* at ¶ 41. When they arrived, Adams walked over to speak with Plaintiff, and Stiel stayed back with Transor, who was approximately twenty feet from the Plaintiff. *Id.* When Adams informed Plaintiff that he was being suspended, he immediately responded by shouting "You're firing me!" loud enough for Stiel and Transor to hear. *Id.* at ¶

---

[16] The Plaintiff does not specifically state whether he disputes this factual allegation. Instead, he notes that Adams placed the call to Newman immediately after speaking with the Plaintiff.

42.  Adams corrected the Plaintiff and told him that he was only being suspended so that they could investigate the mornings incident.  *Id*.  Plaintiff then turned around and told Transor to be careful about anything he said.  *Id*.[17]

After the Plaintiff left the bus shop, Adams spoke with Transor about the morning's incident.  *Id*. at ¶ 43.  Transor confirmed that, while Plaintiff and Stiel were on the phone, Plaintiff refused to paint the rims as Stiel instructed.[18]  The Plaintiff disputes that Transor was asked about what he saw and heard that morning.

In the following days, Adams held multiple conference calls with Alexander, Keen, Jim Lager, the Area Vice President, and David Larew, Labor Counsel, about how to respond to Plaintiff's behavior on January 6, 2009.  *Id*. at ¶ 44.  During these calls, Adams shared what Stiel, Transor, and Plaintiff had reported to him about the phone conversation between Stiel and Plaintiff that morning.  *Id*.  They also discussed Plaintiff's conduct when Adams and Stiel issued his suspension, which included both of their reports that Plaintiff threatened Stiel before leaving the bus shop.  *Id*.  Specifically, both Adams and Stiel explained that, after Plaintiff told Transor to be cautious in the investigation, he proclaimed "Jim Stiel is a liar!" and stated "but that's okay, Jim's gonna get his" which allegedly frightened Stiel.  *Id*.  During these calls, the Defendant contends that no one discussed or mentioned Plaintiff's EEOC filing.  *Id*.  Plaintiff disputes that he ever threatened Stiel.  In fact, he contends that he did not speak to him that

---

[17] Plaintiff does not seem to dispute this factual allegation.  He does note, however, that Stiel and Adams did not intend to fire him when they arrived at the bus shop.

[18] Transor also stated that Stiel called Plaintiff a "mother f[...]" *Id*. at ¶ 43.

morning.[19]  He also disputes Defendant's contention that his EEOC filing was not mentioned in their discussions.

Based on the information Keen received, he determined that Plaintiff's employment should be terminated, and Lager approved his decision.  *Id*. at ¶ 45.  Plaintiff disputes the information underlying Keen's decision.  More specifically, Plaintiff contends that he did not refuse to paint the rims, did not tell Stiel he would not clock out, did not tell Stiel he would not listen, and did not threaten Stiel.  Keen drafted a letter for Alexander to send to Plaintiff, informing him that his employment was terminated for refusing the instructions of his supervisor, as well as for threatening a co-worker.  *Id*. at ¶ 46.  Alexander received the letter on or about January 10, 2009, signed it, and mailed it to Plaintiff on July 12, 2009.  *Id*.  Plaintiff disputes that Alexander received the letter on January 10th and contends the decision to terminate him was made on January 9, 2009.

Plaintiff filed a grievance through his Union immediately after his suspension, alleging that it and his eventual discharge violated the CBA.  *Id*. at ¶ 47.   Plaintiff's grievance went to arbitration, and his claims were ultimately denied.  *Id*.  Plaintiff disputes Defendant's characterization of the outcome of his arbitration. Plaintiff contends that his grievance went to arbitration in protest of the method of discharge, i.e. progressive discharge versus immediate discharge.

In addition to his grievance, Plaintiff filed a second EEOC charge on January 8, 2009.  *Id*. at ¶ 48.  In the charge, he alleged that his suspension was in retaliation for the EEOC charge

---

[19] Plaintiff notes that he filed a grievance on January 7, 2009 which Adams was aware of.

he filed in August 2007.  *Id*.  He later amended the charge to include his termination.  *Id*.[20]

On January 16, 2009, Cullen informed Plaintiff that RPS was cancelling his bus cleaning arrangement.  *Id*. at 49.  Earlier that month, Cullen was told by John Levens, Vice President of RPS, to end the cleaning arrangement with Plaintiff as a cost saving measure.  *Id*.  The Defendant contends that no one at Penske had any input into Leven's decision.  *Id*.  The Plaintiff disputes Defendant's assertion that no one at Penske impacted the termination of his cleaning agreement with RPS.  More specifically, Plaintiff contends that Adams informed Cullen that Plaintiff was terminated on January 12, 2009.  Four days later, his agreement with RPS was terminated.

Finally, on February 23, 2009, Plaintiff filed his third EEOC charge.  In that charge, he alleged that the Defendant caused RPS to cancel his bus cleaning deal in retaliation for the charges he had previously filed.  The following day, on February 24, 2009, Plaintiff filed the underlying suit.  In his Complaint, Plaintiff asserts claims of racial discrimination under Title VII of the Civil Rights Act of 1964 and 42 U.S.C. § 1981 as amended by the Civil Rights Act of 1991, claims of retaliatory discharge under Title VII, § 1981, and the Tennessee Human Rights Act, intentional interference with contract pursuant to Tenn. Code Ann. § 4-21-401 et. seq. and breach of contract pursuant to Tenn. Code Ann. § 47-50-109.[21]

In the instant Motion before the Court, the Defendant contends that no genuine issue of

---

[20] Plaintiff does not indicate whether or not he disputes this allegation of fact.  He does, however, note that he amended his EEOC charge to include retaliatory discharge for "filing grievances and previous charge of unlawful employment practices against the Company."

[21] Plaintiff filed an Amended Complaint (D.E. # 6) on April 13, 2009.  Plaintiff provided additional facts, paragraphs 38-46, in his amendment.

material fact exists as to any of Plaintiff's claims and as such it is entitled to summary judgment.[22]  First, the Defendant argues that the Plaintiff can not make out his prima facie case of race discrimination under Title VII or § 1981 because the Plaintiff can not show that he suffered an adverse action or that he was treated less favorably than a similarly situated white employee.  More specifically, the Defendant contends that the Plaintiff was not paid Reefer Tech pay because he was black but because he did not do Reefer Tech work.  As such, the Defendant contends that the Plaintiff has failed to proffer evidence to show he suffered an adverse action, i.e. that he was paid less.  He can also not show that similarly situated employees were treated more favorably than he was because his two comparators, Scott Carlisle and Ron Benucci, did not work at the bus shop.  Therefore, the Defendant contends that Plaintiff's alleged comparators are not similarly situated to Plaintiff in all relevant respects. The Defendant also argues that Plaintiff can not show that his failure to receive Reefer Tech pay was pretextual.

As to Plaintiff's retaliatory discharge claims under Title VII, § 1981, and the THRA, the Defendant asserts that the Plaintiff can not make out his prima facie case because there is no casual connection between his termination in January 2009 and the filing of his EEOC charge in August 2007, the protected activity.  However, even if the Plaintiff could make out his prima facie case, the Defendant contends that the Plaintiff can not show that its legitimate nondiscriminatory reasons for his termination, refusal to follow Stiel's instruction and threatening Stiel, are pretextual.

---

[22] The Court notes that Defendant's Memorandum is not in compliance with Local Rule 7.2(e).  Rule 7.2(e) states "memoranda in support or in opposition to motions shall not exceed twenty pages without prior court approval, including the statement of facts." Defendant's statement of facts is composed of twelve pages and its memorandum is additionally sixteen. Likewise, Plaintiff's response is also not in compliance with Rule 7.2(e).

The Defendant also contends that the Plaintiff can not make out his claims for intentional interference of contract and breach of contract pursuant to Tenn. Code Ann. § 47-50-109.  The Plaintiff, however, concedes these claims in his response in opposition to the instant Motion.  As such, the Court will address these claims further below.

In response in opposition to Defendant's Motion, the Plaintiff contends that he can make out his prima facie case of racial discrimination under both Title VII and § 1981.  Plaintiff asserts that Carlisle and Benucci, white Tech I's, were similarly situated to him in all relevant respects, despite Defendant's contentions to the contrary. Carlisle and Benucci, however, were not required to work on air conditioner units when they were assigned to the bus shop.  Plaintiff also contends that he can show he suffered an adverse action because he suffered a severe detrimental effect, i.e. he was required to repair air conditioning units on large buses but was not compensated with Reefer Tech equivalent pay.  Additionally, Plaintiff contends that there was no basis in fact to explain why Penske did not require Carlisle and Benucci to work on the air conditioning units.

As to his retaliatory discharge claims, Plaintiff asserts that he can show the fourth element of his prima facie case, i.e. causal connection between the adverse action and protected activity.  Unlike the Defendant who identifies Plaintiff's protected activity as filing an EEOC charge in 2007, the Plaintiff identifies his protected activity as the grievance he filed on January 7, 2009 or the EEOC charge he filed on January 8, 2009 in addition to the 2007 EEOC charge.  Based on these activities, the Plaintiff asserts there is a casual connection between his protected activity and his termination on January 12, 2009.  He also asserts that his termination had no basis in fact because he never refused to paint the rims and because he never threatened Stiel.

17

Plaintiff also seems to assert that his termination was pretextual because his alleged actions were not sufficient to warrant termination but rather merely suspension.

In its reply brief, the Defendant reasserts its position that the Plaintiff can not make out his prima facie case of racial discrimination.  The Defendant contends that Plaintiff was not treated differently than Carlisle.  The Defendant argues any assertion to the contrary on the part of the Plaintiff is a mischaracterization of various testimony.  The Defendant also points out that it does not employ a Ron Benucci, as Plaintiff contends.  As such, Benucci can not serve as Plaintiff's comparator.

The Defendant next argues that Plaintiff can not make out his prima facie case of retaliatory discharge even if his protected activity occurred on January 8, 2009 when he filed his second EEOC charge, rather than in August 2007.  Defendant contends that the Plaintiff has failed to proffer evidence to show that anyone at Penske knew about his most recent EEOC charge prior to his termination.  The Defendant admits that Plaintiff contends Adams was aware of the charge, but the Defendant argues Plaintiff mischaracterizes Adams's testimony.  As such, the Defendant yet again argues that it is entitled to summary judgment.

In his surreply, the Plaintiff contends that the Defendant did not raise its failure to employ Ron Benucci in the instant Motion. The Plaintiff also argues that the Defendant, in pursuit of obtaining summary judgment as to his retaliation claims, manipulates Stiel's deposition testimony by providing a contrary affidavit.

## **STANDARD OF REVIEW**

Federal Rule of Civil Procedure 56(c) provides that a

judgment . . . shall be rendered forthwith if the pleadings, depositions, answers to

interrogatories, and admissions on file, together with the affidavits, if any, show that

there is no genuine issue as to any material fact and that the moving party is entitled

to a judgment as a matter of law.[23]

In reviewing a motion for summary judgment, the evidence must be viewed in the light most

favorable to the nonmoving party.[24]  When the motion is supported by documentary proof such

as depositions and affidavits, the nonmoving party may not rest on his pleadings but, rather, must

present some "specific facts showing that there is a genuine issue for trial."[25]  It is not sufficient

"simply [to] show that there is some metaphysical doubt as to the material facts."[26]  These facts

must be more than a scintilla of evidence and must meet the standard of whether a reasonable

juror could find by a preponderance of the evidence that the nonmoving party is entitled to a

verdict.[27]  When determining if summary judgment is appropriate, the Court should ask "whether

the evidence presents a sufficient disagreement to require submission to a jury or whether it is so

one-side that one party must prevail as a matter of law."[28]

Summary judgment must be entered "against a party who fails to make a showing

sufficient to establish the existence of an element essential to that party's case, and on which that

---

[23] Fed. R. Civ. P. 56(c); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Canderm Pharmacal, Ltd. v. Elder Pharms, Inc.*, 862 F.2d 597, 601 (6th Cir. 1988).

[24] *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

[25] *Celotex*, 477 U.S. at 324.

[26] *Matsushita*, 475 U.S. at 586.

[27] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

[28] *Id*. at 251-52 (1989).

party will bear the burden of proof at trial."[29]  In this Circuit, "this requires the nonmoving party to 'put up or shut up' [on] the critical issues of [her] asserted causes of action."[30]  Finally, the "judge may not make credibility determinations or weigh the evidence."[31]  Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if . . . there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law."[32]

## ANALYSIS

### I.  Plaintiff's Conceded Claims

As an initial matter, the Defendant has argued in the instant Motion that Plaintiff has failed to state his claims of (1) intentional interference with contractual relationship by a third party acting without privilege or justification and (2) violation of Tenn. Code Ann. § 47-50-109. In response, Plaintiff has stated that he concedes these claims.  Therefore, the Court holds that Defendant is entitled to summary judgment on these claims.

### II.  Race Discrimination

#### A. Title VII

The Court concludes that Defendant is entitled to summary judgment as to Plaintiff's Title VII racial discrimination claim.  Title VII prohibits employers from discharging or discriminating against employees based on their race.[33]  In the absence of direct evidence of

---

[29] *Celotex*, 477 U.S. at 322.

[30] *Lord v. Saratoga Capital, Inc.*, 920 F. Supp. 840, 847 (W.D. Tenn. 1995) (citing *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1478 (6th Cir. 1989)).

[31] *Adams v. Metiva*, 31 F.3d 375, 379 (6th Cir. 1994).

[32] Fed. R. Civ. P. 56(c); *see also Celotex*, 477 U.S. at 322 (1986).

[33] *Fuelling v. New Vision Med. Lab. LLC*, 284 Fed. Appx. 247, 253 (6th Cir. 2008).

discrimination, such as here, the McDonnell Douglas/Burdine burden-shifting framework applies

to claims of discrimination brought under Title VII.[34]  In order to make out a prima facie case of

discrimination, Plaintiff must demonstrate that (1) he is a member of a protected class; (2) he

was qualified for the position; (3)  he was subject to an adverse employment action; and (4) a

similarly situated person outside of the protected class was treated more favorably.[35]

Here, it is undisputed that the first two elements of Plaintiff's prima facie case are met.

Plaintiff is a member of a protected class: he is a black male.  Also, there is no question that

Plaintiff was qualified to serve as a Tech I.  Therefore, the only remaining elements are whether

Plaintiff can show that he was subjected to an adverse action and that he was treated less

favorably that a similarly situated person outside of his protected class.

In the Sixth Circuit, an adverse action is defined as:

> [a] materially adverse change in the terms and conditions of employment must be
> more disruptive than a mere inconvenience or an alteration of job responsibilities.
> A materially adverse change might be indicated by a termination of employment,
> a demotion evidenced by a decrease in wage or salary, a less distinguished title, a
> material loss of benefits, significantly diminished material responsibilities, or
> other indices that might be unique to a particular situation.[36]

Under this standard, "de minimis employment actions are not materially adverse and, thus, not

actionable."[37]

Plaintiff contends that he suffered an adverse action because he "was required to repair

the air conditioning units on the large buses and was not accordingly compensated."  Plaintiff's

---

[34] *Id.*

[35] *Clayton v. Meijer, Inc*., 281 F.3d 605, 610 (6th Cir. 2002).

[36] *Hollins v. Atlantic Co*., 188 F.3d 652, 662 (6th Cir. 1999).

[37] *Bowman v. Shawnee State Univ*., 220 F.3d 456, 461-62 (6th Cir. 2000).

argument seems to stem from a fundamental disagreement he has concerning the characterization of "Tech I" work and "Reefer" work under the CBA.  Plaintiff, a Tech I, reasons as follows: (1) Reefer Techs repair and maintain refrigeration units for trucks hauling frozen foods[38]; (2) Reefer Techs are required to have 608 certifications;[39] (3) Plaintiff has a 608 certification;[40] (4) Reefer Tech work is the equivalent of repairing "air conditioning units on the large buses."[41]  As such, Plaintiff contends that he should have been compensated with Reefer Tech pay rather than Tech I pay.  To support this position, Plaintiff argues that he was repeatedly promised Reefer Tech pay by his various Penske superiors and that his Union confirmed that repairing units on large buses requires a 608 certification.

The Court finds Plaintiff's argument without merit.  First and foremost, to suffer an adverse action the Plaintiff must suffer a "material adverse change in the terms and conditions of [his] employment."  Plaintiff has not proffered any evidence to indicate such a change.  Even viewing the evidence in the light most favorable to the Plaintiff, at best, Plaintiff arguably experienced a change in employment around July 2007 when the Defendant stopped sending the

---

[38] Hart Dep. 164:11-16 (Mar. 2, 2010).

[39] Hart Dep. 180:11-13.

[40] Hart Dep. 180:8.  The Court notes that Plaintiff contends that he was required to maintain his 608 certification.  The Defendant disputes this contention.  The Plaintiff, however, attempts to support his position by citing to Chris Transor's EEOC charge.  In Transor's EEOC charge, he states "I was required to obtain my 608 refrigeration license in order to remain at the bus station."  *See* Exhibit H to Pl.'s Resp. to Def.'s Mot. for Summ. J.  The Court notes, however, that Transor's EEOC charge consists of allegations not evidence that both Transor and Hart were required to maintain 608 certification to work at the bus shop.

[41] Hart Dep. 190:19-22.

shuttle buses' air conditioning work out to Crows and kept the work in house.[42]   Although the record is not entirely clear as to when this change occurred, it is at that point in time that Plaintiff began asserting that even though he was classified as a Tech I, he was now doing Reefer Tech type work; and as such, he should receive higher pay.

The proverbial fly in Plaintiff's ointment, i.e. argument, however, is that Defendant at all times classified air conditioning work on shuttle buses as Tech I work.[43]   Plaintiff admits that during the course of his employment he was never employed as a Reefer Tech or required to work on reefer units.[44]   In fact, there is no evidence in the record that the Plaintiff even applied for a Reefer Tech position.   Therefore, as a Tech I, the only possible way Plaintiff would have been entitled to Reefer Tech pay would have been if Defendant classified air conditioning work on shuttle buses as the equivalent of Reefer Tech work.   As the Court previously noted, the Defendant made no such classification. It follows that even if Plaintiff suffered a "change" in employment when he began working on the air conditioning units, the change was not materially adverse as it was still within his Tech I classification, despite his contentions to the contrary.

The Court notes that Plaintiff contends that he was promised Reefer Tech pay by "Cal Alexander, Tony Cox, Jeff Hunt, basically Terry Keen."[45]   Alexander testified that he discussed with Plaintiff his making Reefer Tech pay and even that he brought it up with corporate in St.

---

[42] Hart Dep. 186:11-15.  The Court notes that the record is not entirely clear when Defendant stopped sending the air conditioning work to Crows.

[43] Alexander Dep. 11:14-20 (Mar. 3, 2010).  Alexander testified that "this is not reefer work for the air conditioning units.  It's the way we have all the bus shops across the country, which we had several at the time."

[44] Hart Dep. 189:4-10.

[45] Hart Dep. 165:18-19.

Louis.[46]  Alexander, however, disputes that he ever promised Plaintiff the higher pay.[47]  Even if

the Court views the evidence in the light most favorable to the Plaintiff and assumes that such

promises were made, the Court cannot view an unfilled promise taken alone as an adverse action.

Under this logic, the Court would have to first conclude that the promise to receive Reefer Tech

pay constituted a "change" in Plaintiff's employment.  Then, the Court would have to conclude

that Defendant's failure to follow through with the promise was materially adverse.  In the Sixth

Circuit, adverse actions typically are more concrete actions such as termination, demotion, or a

reduction in title.  As such, the Court finds that a mere promise of future pay without more is too

speculative to constitute an adverse action when the promise is not fulfilled.

The Plaintiff also argues that the "Union confirmed that the EPA 608 certification for

working on the large bus air conditioning units were the same as requirements for a Reefer

Tech."  Plaintiff cites to a August 20, 2007 letter he received from Terry Loven, President and

Business Manager of Plaintiff's Union, for this proposition.[48]  Plaintiff, however, somewhat

mischaracterizes Loven's letter.  In the letter, Loven states in part:

> There are some grey areas, and one would assume that this would be the case.
> The company's position was that you are not working on a reefer, which would be
> the Refrig. Tech position.  Requirements to work on a Bus A/C unit requires the
> same certification as a Refrig. Tech, but it is not classified as a Reefer Unit. . . I
> will say this, there will be contract negotiations coming up in the near future and I
> would suggest that you submit a proposal for the new contract concerning your
> matter . . .

While it is true that Loven states that "requirements to work on a Bus A/C unit requires the same

---

[46] Alexander Dep. 11:3-20.

[47] Alexander Dep. 11:19-20.

[48] *See* Exhibit 11 to Hart Dep. (D.E. # 25-4).

certification as a Refrig. Tech," the letter also points out that Defendant did not classify the work as equivalent and that if the Plaintiff wanted to pursue the matter further he should have the Union renegotiate on his behalf.  Additionally, the Court notes that Loven is a Union employee, not a representative of the Defendant.  Therefore, at best, the letter arguably merely represents the Union's interpretation of the question at hand.

Even assuming, however, for purposes of this Motion that Plaintiff is able to show that he suffered an adverse action in not being paid Reefer Tech pay, the Court finds that Plaintiff can not show that he was treated less favorably than a similarly situated person outside of his protected class.  As a preliminary matter, the Court notes that Plaintiff identifies two individuals as his comparators: Scott Carlisle and Ron Benucci.  Curiously, however, the parties dispute the very existence of Ron Benucci.

In the instant Motion before the Court, the Defendant states "[w]hile both Mr. Benucci and Mr. Carlisle were Techs like Plaintiff, neither of them worked at the bus shop . . ."  In its reply brief, however, the Defendant notes in footnote two "Penske, however, does not employ a Ron Benucci at any of its Memphis operations. It does employ a Ron Materna at its Getwell Road facility, who is a Tech I like Plaintiff, but Penske has no record that Mr. Materna ever worked any shifts at the Hanger Road bus shop."  From the Court's review of the record, the only mention of any "Ron Benucci" occurs in Plaintiff's deposition.[49]  Even Plaintiff, however, was not entirely sure about Ron's last name.  For instance, Plaintiff testified "I don't remember what I just said - - the person's name.  I want to say Ron Benucci but Ron - - I don't remember

---

[49] Hart Dep. 173:9.

Ron's last name."[50]  At this stage, however, it is the Plaintiff's burden to come forward with comparators to make out his prima facie case.  The Court declines to consider Ron Benucci as one such comparator since his very existence is in question.  While the Court assumes that the Plaintiff may just be confused about Ron's last name, the record is void of any declaration or affidavit to clear up this confusion.  Therefore, the Court will not include "Ron Benucci" in its analysis.

To satisfy the similarly situated requirement, a plaintiff must show that a comparable employee is similar in all of the relevant aspects.[51]  While the precise aspects of employment that are relevant to determining whether the similarly situated requirement has been satisfied depend on the facts and circumstances of each case, the Sixth Circuit has generally focused on whether the plaintiff and the comparable employee: (1) share the same supervisor; (2) are subject to the same standards; and (3) have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them.[52]  The Sixth Circuit has elaborated to be similarly situated, a comparator must have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish his conduct or his employer's treatment of them for it.[53]

Plaintiff argues that he is similarly situated to Carlisle, a white male, in all relevant respects because both men (1) reported directly to Stiel; (2) both were classified as Tech I's

---

[50] Hart Dep. 173:14-16.

[51] *Barry v. Noble Metal Processing, Inc.*, 276 Fed. Appx. 477, 480 (6th Cir. 2008). *See also Ercegovich v. Goodyear Tire & Rubber Co.,* 154 F.3d 344, 352 (6th Cir. 1998).

[52] *Barry*, 276 Fed. Appx. at 480-81. (internal citations omitted).

[53] *Mitchell v. Toledo Hosp*., 964 F.2d 577, 583 (6th Cir. 1992).

26

under the CBA, and (3) both had the 608 certification.  Plaintiff admits that Carlisle was not assigned to work full-time at the bus shop, as he was, but notes that Carlisle did fill in to support the excess workload and vacation coverage.  However, unlike him, Plaintiff contends Carlisle was not required to work on the air conditioning units when he refused.

Plaintiff appears to argue that because Carlisle allegedly was not required to work on the air conditioning units he was not underpaid as Plaintiff was.  Therefore, Plaintiff contends that he was treated less favorably than Carlisle.

First, it seems undisputed that Plaintiff and Carlisle were both similarly situated in terms of reporting to the same supervisor, Jim Stiel, and were subjected to the same standards.  The Defendant, however, contends that Plaintiff and Carlisle were not treated differently.  More specifically, the Defendant asserts that Carlisle did perform air conditioning work as a Tech I, just as Plaintiff did.

The Court notes that Plaintiff testified in his deposition that Carlisle was not a Reefer Tech and as such was not paid Reefer Tech pay, but Carlisle was not required to work on the air conditioning units on the shuttle buses.[54]  Plaintiff's contention that Carlisle was not required to work on the air conditioning units, however, is completely unsupported in the record.  Plaintiff cites to both his own testimony and Stiel's to support his position.  Plaintiff grossly mischaracterizes Stiel's deposition testimony.  In fact, Stiel actually testified that he did not know if Carlisle worked on air conditioning units when he was assigned to the bus shop.[55]

---

[54] Hart Dep. 174:1-24, 175:1.

[55] Stiel Dep. 44:5-6 (Mar. 3, 2010). "Q. So they would not work on work that would be classified as that this memo addressed the code, comp code 01? A. The thing is I don't know. It's based on what had to be done that day."

Furthermore, Carlisle himself averred that he worked on the air conditioning units when he was assigned to the bus shop and on air conditioning units of large container trucks at the Getwell Road facility, his permanent location.[56]

To be similarly situated, the Court admits Plaintiff merely has to put forth enough evidence to show that he and Carlisle were similarly situated in all relevant respects. Here, at the very least, the Plaintiff has to show that Carlisle never engaged or was asked and refused to engage in working on the air conditioning units the Plaintiff considered to be Reefer Tech type work. Plaintiff has simply proffered no evidence to support this contention.

However, even if the Court views the evidence in the light most favorable to the Plaintiff and assumes that Carlisle was not required to do the air conditioning work, this fact is immaterial. As the Court previously noted, Defendant did not classify air conditioning work on shuttle buses as Reefer Tech type work, despite Plaintiff's contentions to the contrary. The fact that the Plaintiff did a task that was Tech I type work and Carlisle did not, can not show the two were treated differently. Therefore, Plaintiff has failed to proffer evidence to show that he was treated less favorably than someone who was similarly situated to him and as a result has not made out his prima facie case. As such, Defendant's Motion as to this claim is **GRANTED**.

*B. 42 U.S.C. § 1981*

The Court notes that Plaintiff also states a claim for racial discrimination under 42 U.S.C. § 1981. The Court's analysis under this statute, however, is identical to that under Title VII.[57]

---

[56] Carlisle Decl. 2-3. The Court notes that Carlisle's Declaration is signed but not dated.

[57] *Johnson v. Univ. of Cincinnati*, 215 F.3d 561,573 n.5 (6th Cir. 2000)(the elements of prima facie case as well as the allocations of the burden of proof are the same for employment claims stemming from Title VII and § 1981).

As such, Defendant's Motion as to this claim is also **GRANTED**.

### III.  Retaliation

*A. Title VII*

In order to make out a prima facie case of retaliation, Plaintiff must demonstrate (1) that he engaged in protected conduct; (2) that Defendant had knowledge of his protected activity; (3) that Defendant took an adverse employment action against him; and (4) that there was a causal connection between the protected activity and the adverse employment action.[58]

In the instant Motion, the Defendant does not dispute that the Plaintiff engaged in a protected activity when he filed an EEOC charge in August 2007.  The Defendant, however, does contend that the EEOC charge was filed seventeen months before his termination.  And, as such,  there is no casual connection between the two events.  In response, however, the Plaintiff identifies his protected activity as the grievance he filed on January 7, 2009.  In its reply brief, the Defendant identifies Plaintiff's protected activity as the EEOC charge he filed on January 8, 2009.  More specifically, Defendant argues "Plaintiff has now changed course to argue, primarily, that Penske converted his suspension to a termination *after* realizing that he filed another EEOC charge on January 8th."  Defendant only makes mention of Plaintiff's January 7, 2009 grievance in footnote seven of his reply brief.  Asserting that Keen had no knowledge of Plaintiff's grievance, Defendant dismisses it as a potential protected activity.

As to the first element of Plaintiff's prima facie case, the Court finds that Plaintiff engaged in three incidents of protected activity: (1) the August 10, 2007 EEOC charge; (2) the

---

[58] *Burlington N. & Sante Fe Ry. Co. v. White*, 548 U.S. 53, 126 S.Ct. 2405, 165 L.Ed.2d 345 (2006).

January 7, 2009 grievance, and (3) the January 8, 2009 EEOC charge.[59]  Whether the Defendant had knowledge of all or some of these protected activities, however, is somewhat unclear from the record before this Court.

In the instant Motion, it seems undisputed that the Defendant had knowledge of the EEOC charge Plaintiff filed in August 2007.  The more critical inquiry for this activity, however, is the causal connection between his suspension/termination and the filing of the EEOC charge itself.  The Court, however, will address this matter more further below.  As to the grievance Plaintiff filed with his Union on January 7, 2009, the Defendant contends that neither Adams or Keen had any knowledge of the grievance prior to terminating Plaintiff.  The record, however, is not entirely clear on this point.

Adams testified that he did not recall when he received the January 7th grievance.[60]  Adams, however, also admitted that he was sent a fax by Ed Houston on August 8, 2009 concerning Plaintiff's grievance.[61]  Keen in his declaration stated that "during these

---

[59] Title VII defines "protected activity" in pertinent part as:

It shall be an unlawful employment practice for an employer to discriminate against any of his employees.. because [the employee] has opposed any practice made an unlawful employment practice by this subchapter, or because [s]he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.  42 U.S.C. § 2000e-3(a).

The Court notes that Plaintiff also filed a grievance with his Union on August 2, 2007. *See* Exhibit 10 to Hart Dep. (D.E. # 25-4).  The parties, however, do not identify this grievance as a protected activity.  While arguably it would be, the Court declines to delve any further into this analysis as neither party mentions it.

[60] Adams Dep. 95:11-21 (Apr. 20, 2010).

[61] Adams Dep. 95:2-18.  The Court notes that there was some confusion as to what was actually attached to the fax.  Adams stated "Well, I believe that we've got something confused here, because this was - at the bottom it says, copy of Chris's statement, but then this is not a

conversations [pre-Plaintiff's termination] no one discussed or mentioned Plaintiff's race, his previous EEOC charge, or any of his other internal complaints or grievances."[62]  Admittedly, Keen's declaration makes no mention of his knowledge prior to these "conversations."  The confusion in the record, however, occurs in Alexander's deposition testimony.

Alexander testified that he, Lager, Keen, and Adams all had conversations about the grievance Plaintiff filed.  His testimony, however, does not specifically identify if the "grievance" was the July 7th grievance.  From the context of the testimony, the Court assumes it was. Alexander testified as follows:

> Q.  What happens after you denied this grievance, do you know?
>
> A.  When I deny a grievance it's the union's choice at that point to pursue it. They will then if they want to escalate to the next step.  It goes to my boss Jim Lager or an area manager type level that responds to that grievance.  If they want to take it a step further then we have a meeting and it goes to arbitration.
>
> Q.  Okay.  And do you know if this went up to Mr. Lager?
>
> A. Yes, it did.
>
> Q. And did you have some conversations with Mr. Lager about it?
>
> A. Myself, Mr. Lager, Terry Keen, Andy all had conversations about this.
>
> Q. What did you guys talk about?
>
> A. We talked about the very severity of it, talked about the issues on all ends and made a company decision.
>
> Q. What was that decision?

_____

copy of Chris's statement.  This is actually something else.   Because I do recall Mr. Houston sending me Chris's statement in writing on what happened that day."

[62] Keen Decl. ¶6 (May 20, 2010).

A. To terminate Mr. Hart.[63]

Additionally, in a letter dated January 9, 2009, Alexander wrote to Houston, Plaintiff's Union

representative, "Ed, after reviewing Dennis's grievances I am denying the grievance."  Keen is

copied on the letter.[64]  Taking the evidence in the light most favorable to the Plaintiff, for

purposes of this Motion, the Court will assume that Defendant had knowledge of the July 7th

grievance prior to his termination.

Plaintiff also contends that Adams had knowledge of his January 8, 2009 EEOC charge.

Specifically, Plaintiff states in his Response brief "[i]n addition to his knowledge of Plaintiff's

grievance, Adams testified that he knew that Plaintiff had filed a charge of retaliation with the

EEOC *before* the decision to terminate."  Plaintiff, however, yet again mischaracterizes Adam's

testimony.

In actuality, Adams testified that he had knowledge of the August 8, 2007 EEOC charge

prior to Plaintiff's termination, not the January 8, 2009 charge.  Adams testified as follows:

> Q.  Were you aware in August of 2007 that Mr. Hart filed a Charge of
> Discrimination with the Equal Employment Opportunity Commission over the
> reefer tech issue?
>
> A.  I was not.
>
> Q.  When did you become aware of Mr. Hart pursuing a charge of discrimination

---

[63] Alexander Dep. 18:2-23.  The Court received page 18 of Alexander's deposition. However, in none of the parties filings did it receive page 17.  The Court assumes the date of the grievance was specified on that page.

Additionally,(D.E. # 25-4) contains a January 9, 2009 letter from Alexander to Houston. In the letter, Alexander states "Ed, after reviewing Dennis's grievances I am denying the grievance." Carbon copied on the letter are David Lerew, Jim Lager, Terry Keen, and Andy Adam.  As such, this letter too supports the Court's conclusion.

[64] *See* (D.E. # 25-4).

32

over the reefer tech issue?

A. I don't recall, but it was much later. Dennis himself actually told me.

Q. Was it prior to his suspension and termination?

A. Yes[65]

Therefore, the Court finds for purposes of this Motion, at most, the Defendant had knowledge of Plaintiff's August 8, 2007 EEOC charge and January 7, 2009 grievance prior to his termination.

As to the next element, adverse action, Plaintiff contends that Defendant took an adverse employment action against him when he was terminated. Additionally, Plaintiff identifies various "retaliatory actions" that he contends were also adverse actions. For instance, Plaintiff seems to contend that (1) a statement Cullen allegedly made to his assistant about Plaintiff's future employment with the Defendant, (2) alleged unaddressed disparaging remarks made towards Plaintiff, (3) Adams alleged statement that Defendant had many lawyers, and (4) Stiel's alleged comment towards Plaintiff at his suspension to "shut the hell up, mother f[...]" in combination constituted an adverse action.

First, the Court notes that the Plaintiff does not provide any sort of time frame for any of the allegations, i.e. (1)-(4), he contends combine to equate to an adverse action. From a review of the record, however, the alleged statement made by Cullen's assistant appears to have been made on or around August 3, 2007.[66] As to Stiel's alleged statement, it is well established in this Circuit that petty slights and insults do not constitute adverse actions.[67] In terms of the disparaging remarks, Plaintiff does not identify what the remarks were, so the Court declines to

---

[65] Adams Dep. 35:8-19.

[66] Moody Aff. ¶ 1 (June 16, 2010).

[67] *Burlington N. & Santa Fe R. Co.*, 126 S.Ct. at 2415.

address them further.  And, finally as to Adams' statement about the number of Defendant's lawyers, Adams' testimony is not quite as Plaintiff construes it.  Adams testified as follows: "Q. Did you tell Mr. Hart that if he pursued this, he couldn't win because you've got one lawyer probably on retainer for $50 but Penske has many lawyers? A. You know, I remember having several conversations with Dennis.  I don't recall a $50 conversation.  I do maybe recall telling him that Penske has attorneys, yes."[68]  Even if the Court were to construe Adams testimony as Plaintiff does, Adams' comment likely falls within the "insult" category that does not constitute an adverse action.  However, the Court does find that Plaintiff's suspension and termination both do constitute adverse actions.[69]

As for the causal connection, Plaintiff must "produce sufficient evidence from which an inference could be drawn that the adverse action would not have been taken had the plaintiff not engaged in protected activity.[70]  "Although no one factor is dispositive in establishing a causal connection, evidence that defendant treated the plaintiff differently from similarly situated employees or that the adverse action was taken shortly after the plaintiff's exercise of protected rights is relevant to causation."[71]  Under general principles of anti-discrimination law, temporal proximity between a plaintiff's protected activity and an adverse employment action is not enough.[72]  A plaintiff must also present other circumstantial evidence to prove the causal

---

[68] Adams Dep. 107:1-7.

[69] Examples of adverse employment actions include firing and suspension.  *Burlington Indus. Inc. v. Ellerth*, 524 U.S. 742, 761, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998).

[70] *E.g. Nguyen v. City of Cleveland*, 229 F.3d 559, 563 (6th Cir. 2000).

[71] *Id*.

[72] *Id*.

connection.[73]  Nevertheless, the Sixth Circuit has held that "in certain distinct cases" temporal proximity alone can be sufficient as indirect evidence to establish the causal connection element of a prima facie case.[74]

In the instant Motion, the Defendant contends that there is no temporal proximity between Plaintiff's protected activity of filing an EEOC charge in August 2007 and his termination in January 2009.  Defendant notes that Plaintiff seems to assert five instances of retaliatory conduct in an attempt to overcome this significant lapse in time.  As noted above, in his Response brief, Plaintiff identifies his relevant protected activity as the January 7, 2009, grievance, not the August 2007 EEOC charge.  Based on Plaintiff's reasoning, the Court declines to analyze the causal connection between Plaintiff's initial EEOC charge and his termination.

The more critical inquiry for the Court therefore is whether Plaintiff has proffered sufficient evidence to show a causal connection between his protected activity of filing the January 7th grievance and his termination.  For purposes of this Motion, the Court is going to assume that Plaintiff has made this showing.

Plaintiff was placed on suspension on January 6, 2009.  The following day, Plaintiff filed a grievance with his Union.  In the grievance, Plaintiff stated in part: "I also feel that the conduct by management of Penske is due to my filing a discrimination complaint with the EEOC, I also feel that is because of my race."[75]  On January 12, 2009, four days after Plaintiff filed his

---

[73] *Id.*

[74] *DiCarlo*, 358 F.3d at 420 (where "proximity between the protected activity and the adverse employment action is acutely near in time"); *Skrjanc v. Great Lakes Power Service Co.*, 272 F.3d 309, 314 (6th Cir. 2001).

[75] *See* Hart Dep. (D.E. # 25-4).

grievance and at most three days after Defendant had knowledge of such filing, Plaintiff was terminated.

As the Court mentioned above, temporal proximity alone is not sufficient to establish the causation element of Plaintiff's prima facie case.  However, the Court notes that the Sixth Circuit has also stated "in certain distinct cases where the temporal proximity between the protected activity and the adverse employment action is acutely near in time, that close proximity is deemed indirect evidence such as to permit an inference of retaliation to arise."[76]  The Sixth Circuit applied this logic in a case where there was a twenty-one day lapse between the protected activity and the adverse action.[77]

In this case, there was arguably at most three days between the time Defendant learned of Plaintiff's grievance and his termination, January 9th to January 12th.  Therefore, for purposes of this Motion the Court assumes that this case falls within the category of "distinct cases where . . . the close proximity is deemed indirect evidence . . . to permit an inference of retaliation."  As such, the Court finds that Plaintiff has proffered sufficient evidence to make out his prima facie case.

Once the prima facie case is made, a defendant may offer any legitimate, non-discriminatory reason for the employment action, which the plaintiff may rebut by evidence of pre-text; however, the burden of proof always remains with the plaintiff.[78]  It is important to note that the defendant need not prove a nondiscriminatory reason, but need merely articulate a valid

---

[76] *Dicarlo*, 358 F.3d at 421.

[77] *Id*. at 421-22.

[78] *Hartsel v. Keys*, 87 F.3d 795, 800 (6th Cir. 1996).

reason.[79]

The Court finds that the Defendant has proffered two legitimate, non-discriminatory reasons: (1) Plaintiff's refusal to follow Stiel's instruction to paint the rims and (2) Plaintiff's threatening of Stiel.  Admittedly, the Plaintiff denied both instances.  However, as noted above, the Defendant "need not prove a nondiscriminatory reason."

Once the defendant carries its burden of production, as the Defendant has done so here, plaintiff must then prove by a preponderance of the evidence that the defendant's proffered reasons were not its true reasons, but were merely a pretext for illegal discrimination.[80]  More specifically, a plaintiff must produce evidence that a jury could reasonably reject the employer's explanation for its decisions.[81]

To raise a genuine issue of material fact on the validity of an employer's explanation for an adverse job action, the plaintiff must show, again by a preponderance of the evidence, either (1) that the proffered reasons had no basis in fact; (2) that the proffered reasons did not actually motivate the action; or (3) that they were insufficient to motivate the action.[82]

Accordingly, the plaintiff must allege more than a dispute over the facts upon which his discharge was based.[83]  He must put forth evidence which demonstrates that the employer did not "honestly believe" in the proffered non-discriminatory reason for its adverse employment

---

[79] *Id.*

[80] *Kocsis v. Multi-Care Mgmt., Inc.*, 97 F.3d 876, 883 (6th Cir. 1996).

[81] *Id.*

[82] *Id.*

[83] *Braithwaite v. Timken Co.*, 258 F.3d 488, 493 (6th Cir. 2001).

action.[84]  In order to determine whether the defendant had an "honest belief" in the proffered

basis for the adverse employment action, the Court looks to whether the employer can establish

its "reasonable reliance" on the particularized facts that were before it at the time the decision

was made.[85]

 Here, the Plaintiff contends that Defendant's proffered reasons for his termination had no

basis in fact.  For instance, Plaintiff argues that he "never refused to follow Stiel's instruction or

refused to listen to Stiel" and "did not make intimidating or threatening remarks or gestures

towards Stiel." The argument, however, is somewhat beside the point.  In determining if the

plaintiff has raised a genuine issue of material fact as to pretext, the Court should consider not

whether Plaintiff actually refused to paint the rims or threatened to Stiel, but rather whether the

Defendant had an honestly held belief that he had committed such offenses.[86]  The Sixth Circuit

has explained that:

> the key inquiry in assessing whether an employer holds such an honest belief is
> whether the employer made a reasonably informed and considered decision
> before taking the complained - of action.  An employer has an honest belief in its
> rationale when it reasonably relied on the particularized facts that were before it
> at the time the decision was made. [W]e do not require that the decisional process
> used by the employer be optimal or that it left no stone unturned.[87]

Applying this standard to the record before this Court, the Court finds that the Defendant did

hold an honest belief that Plaintiff both refused to paint the bus rims and threatened Stiel.  Under

the terms of the CBA, both of these offenses allowed for his immediate termination.  Article V of

---

[84] *Id*. at 494.

[85] *Id*.

[86] *See generally Allen v. Highlands Hosp. Corp*., 545 F.3d 387, 398 (6th Cir. 2008).

[87] *Michael v. Caterpillar Fin. Serv. Corp*., 496 F.3d 584, 598-99 (6th Cir. 2007).

the CBA states:

> No warning notice need be given in the case . . . assaulting or threatening another employee, a member of supervision or a customer . . . or . . . failure to carry out reasonable instructions that do not conflict with the terms of this Agreement.[88]

Here, the record indicates Adams interviewed both Stiel and Transor regarding Plaintiff's refusal to paint the bus rims on the morning of January 6, 2009.[89]  According to Adams, Transor admitted that the Plaintiff refused to follow Stiel's instruction.[90]  Transor also testified as much before the Appeals Tribunal of the Tennessee Department of Labor and Workforce Development.[91]  Transor stated "Yes, sir, he said, I'm not going to paint the buses today due to the weather - weather conditions."[92]  Stiel also informed Adams that Plaintiff refused to paint the rims.[93]  Keen, Defendant's Human Resources Manager, conducted multiple conference calls with Adams, Alexander, Lager, and Lerew to discuss Plaintiff's conduct on the morning of January 6, 2009.[94]  From these discussions, Keen concluded that "Stiel had instructed Plaintiff to paint the rims on the airport's shuttle buses as soon as they were in the shop and that Plaintiff refused to do so."[95]

---

[88] Article V: *Conduct of Employees*, CBA, Exhibit 3 to Hart's Dep. (D.E. # 25-4).

[89] Adams Dep. 70:23-24; 71:1-3.

[90] Adams Dep. 71:1-3.

[91] *See* Exhibit F, p. 121, to Pl.'s Resp. to Def.'s Mot. for Summ. J.

[92] *Id*. at 121.

[93] Stiel Dep. 70:1-7.

[94] Keen Decl. ¶ 3.

[95] Keen Decl. ¶ 4.

As an aside, however, the Court notes that Plaintiff also argues in his response that "he was not given the opportunity to paint the rims because he was suspended prior to his shift ending."[96]  To support this position, Plaintiff contends that:

> the first bus that needed to be painted, RPS1987, arrived in the bus shop at 11:42am, less than an hour before Adams and Stiel arrived at the bus shop to suspend Plaintiff.  Plaintiff was completing his end-of-shift work because his scheduled shift ended at 12:30 pm. Plaintiff was not given the opportunity to paint the rims because he was suspended prior to his shift ending . . .[97]

Beyond this assertion, however, the Plaintiff does not develop his argument further.  Therefore, the basis of Plaintiff's argument is unclear to the Court.  However, even if the Court were to assume that Plaintiff was attempting to suggest Stiel's instruction was unreasonable due to his shift ending, the Defendant had a second legitimate basis for his termination: threatening Stiel.

During Keen's investigation, he also interviewed Stiel and Adams regarding Plaintiff's alleged threat towards Stiel during the execution of Plaintiff's suspension.[98]  Adams and Stiel both reported that Plaintiff stated "Jim Stiel is a liar!" and "Jim's gonna get his."[99]  Based on this investigation, the Court concludes that the Defendant "reasonably relied on the particularized facts that were before it" in deciding to terminate Plaintiff.

Plaintiff also fails to show that a trier of fact could find that the proffered reasons for his termination did not actually motivate Defendant's action.  The Plaintiff here simply reiterates his allegations concerning Keen's knowledge of his grievance and EEOC charge prior to his

---

[96] Pl.'s Resp. to Def.'s Mot. for Summ. J., 17.

[97] *Id.*

[98] Keen Decl. ¶ 5.

[99] Keen Decl. ¶ 5.

termination.  Aside from the fact that there is no support in the record that Keen had any knowledge of Plaintiff's January 8, 2009 EEOC charge prior to his termination, these contentions support Plaintiff's prima facie case, not a showing of pretext.  The Plaintiff does not appear to rely on the third method of establishing pretext.  As such, Defendant's Motion as to this claim is **GRANTED**.

> B. 42 U.S.C. § 1981 and the THRA

The Court notes that Plaintiff also asserts claims for retaliation under 42 U.S.C. § 1981 and the THRA.  The Court's analysis under these statutes, however, are identical to that under Title VII.[100]  As such, Defendant's Motion as to this claim is also **GRANTED**.

<u>**CONCLUSION**</u>

For the reasons stated above, Defendant's Motion is **GRANTED**.

**IT IS SO ORDERED**.

> **s/ S. Thomas Anderson**
> S. THOMAS ANDERSON
> UNITED STATES DISTRICT JUDGE
>
> Date: August 12th, 2010.

---

[100]  *Johnson*, 215 F.3d at 573 n.5 (the elements of prima facie case as well as the allocations of the burden of proof are the same for employment claims stemming from Title VII and § 1981). *See also Frizzell v. Sw. Motor Freight*, 154 F.3d 641, 646 (6th Cir. 1998)(claims of discrimination brought pursuant to the THRA are evaluated under the same analytical framework and federal case law that applies to claims brought pursuant to Title VII).